**NATIONAL CABLE TELEVISION ASSOCIATION, INC., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

No. 82–1058.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 13, 1983.

Decided Nov. 9, 1984.

9. *See* cases cited *supra* at p. 1501.

.Arthur H. Harding, Washington, D.C., with whom Brenda L. Fox and Jonathan V. Cohen, Washington, D.C., were on the brief for petitioner. Robert J. Keller, Washington, D.C., also entered an appearance for petitioner.

Jane E. Mago, Atty., F.C.C., Washington, D.C., for respondents. Bruce E. Fein, Gen. Counsel, and Daniel M. Armstrong, Associate Gen. Counsel, and John E. Ingle, Deputy Associate Gen. Counsel, Washington, D.C., for F.C.C. Barry Grossman and George Edelstein, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents. Stephen A. Sharp and Lisa B. Margolis, Washington, D.C., for F.C.C., also entered appearances for respondents.

David Cosson, Washington, D.C., with whom Amy S. Gross and G. Daniel McCarthy, Washington, D.C., were on the joint brief for intervenors Nat. Telephone Cooperative Ass'n, et al. Thomas G. Shack, Jr., and Raymond J. Kimball, Washington, D.C., also entered appearances, for Kearsarge Cable Communications, Inc.

Thomas J. O'Reilly and Shelly Sternad Dempsey, Washington, D.C., were on the brief for intervenor U.S. Independent Telephone Ass'n.

David A. Irwin and Ellen S. Deutsch, Washington, D.C., entered appearances for intervenor Organization for the Protection and Advancement of Small Telephone Companies.

Robert F. Corazzini, Peter H. Feinberg and Deborah L. Stuehrmann, Washington, D.C., entered appearances for intervenor Multivision Northwest Inc.

Arthur Blooston and David L. Nace, Washington, D.C., entered appearances for Missouri Telephone Co., et al.

Before WALD and STARR, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

The National Cable Television Association ("NCTA"), a trade association representing cable television operators, owners, and suppliers, challenges a rule of the Federal Communications Commission ("FCC" or "Commission") lessening the burden that telephone companies must overcome before being allowed to provide cable service to rural areas. We uphold the rule as consistent with the FCC's statutory mandate and the requirements of the Administrative Procedure Act.

I

Conventional television broadcasters send signals through the air so that any individual with an antenna can receive them free of charge. Such broadcasters rely for their revenues upon the payments of advertisers. Cable television, in contrast, sends signals to a centralized antenna, and then through a cable to the homes of individuals. Cable broadcasters typically rely for their revenues upon the payments of those who receive the signals.

One of the chief expenses in providing cable television service is the laying or stringing of the cable. Using the existing poles of the local telephone company greatly reduces that expense, since little or no erection of new poles is necessary. Telephone companies might therefore be able to offer cable services more cheaply than those unfairly denied access to such poles or lines, or be able to extract a monopolist's premium from providers of cable services if the phone company were to choose instead to provide access.[1] The business experience of long-established local phone companies—particularly their familiarity with local governmental officials who may be responsible for granting both telephone and cable-television franchises—might also give a telephone company an unfair advantage in its competition with members of the

---

**1.** The opportunities for phone companies to extract such a premium have diminished with the passage of an act giving the FCC the power to regulate pole attachment rates. *See* 47 U.S.C. § 224 (1982).

"infant" cable industry. *Cf. Report and Order,* 82 F.C.C.2d 233, 244 para. 28 (1979) (mentioning past concerns of FCC over phone companies' "ability to circumvent the local franchising process"). Because the FCC does not wish to further such anticompetitive practices by phone companies and because the FCC often considers diversity in the provision of media services to be an end in itself, *see National Association of Broadcasters v. FCC,* 740 F.2d 1190, 1207 (D.C.Cir.1984), the FCC has frequently regulated the role of local telephone companies in providing cable television. The FCC's primary means of such regulation has been its "cross-ownership" rules, which generally prohibit the provision by telephone companies or their direct subsidiaries of cable programming. 47 C.F.R. §§ 63.54–.58 (1983); *see General Telephone Co. v. United States,* 449 F.2d 846 (5th Cir.1971) (upholding legality of original version of cross-ownership rules).

In areas where population density is sufficiently low, however, independent cable companies cannot profitably provide services, and thus the local phone company is the inhabitants' only hope for cable service. The FCC must therefore balance the concerns served by its minimization of anticompetitive practices by local phone companies with its efforts to provide services to rural inhabitants. In pursuit of the proper balance, the FCC in 1970 allowed phone companies to provide cable service if they could show that such service "demonstrably could not exist" otherwise. *Section 214 Certificates,* 21 F.C.C.2d 307, 326, *reconsidered in part,* 22 F.C.C.2d 746 (1970), *aff'd sub nom. General Telephone Co. v. United States, supra.*

With the maturation of the cable industry during the 1970's, the need for protecting the industry lessened and the plight of communities without cable service became relatively more visible. *See Notice of Proposed Rulemaking,* 84 F.C.C.2d 335, 339 para. 13 (proposed Jan. 22, 1981) (discussing growth of cable during 1970's) [hereinafter cited as *NPRM*]. In 1979, the FCC allowed phone companies to provide cable service if they could show that the area they wished to serve could not "feasibly" be served by cable, and simultaneously set a presumption that independent cable service was infeasible in areas with a density of less than 30 homes per mile of cable route proposed. *Report and Order,* 82 F.C.C.2d at 242–43 paras. 21–22. A cable company could rebut the presumption either by showing it had a present intention to offer essentially the same service to the area or that the phone company had miscalculated the relevant density. *See id.* at 243–44 paras. 24, 26–27.

Early in 1981, the FCC continued the trend towards relaxation of the cross-ownership rule by releasing a notice of proposed rule-making (NPRM) on an outright exemption from the cross-ownership rules for telephone companies serving rural areas. *NPRM, supra.* The FCC stated that applications had increased significantly with the adoption of the 1979 procedures, *id.* at 338 para. 7, but that even the streamlined waiver procedure discouraged some telephone companies from providing service, *id.* at 338–39 paras. 9–10. The FCC offered a number of alternative definitions of "rural." Among alternative "rural" areas were those with fewer than 30 homes per mile—the standard of the waiver proceedings—and those lacking communities more populous than 1500 persons. *Id.* at 341 para. 20.

On November 27, 1981, the FCC announced its final rule. *Report and Order,* 88 F.C.C.2d 564 (1981), *reconsideration denied,* 91 F.C.C.2d 622 (1982). The Commission stated that it was retaining the fundamental assumptions behind the cross-ownership rules but shifting the balance between providing service to rural areas and minimizing the potential anticompetitive effect of local phone companies' provision of cable service. 88 F.C.C.2d at 573 para. 31.

The rule exempted phone companies from the cross-ownership provision whenever they were proposing service of rural areas not currently served by cable operators. At the same time, however, the Commission noted that it would "continue to

require waivers of telephone companies who propose cable television service in any area where a competing cable television system is under construction or in existence." *Id.* at 576 para. 42. The rule also made clear that phone companies proposing to provide cable service must continue to complete an application pursuant to section 214 of the Communications Act, though the Commission's precise treatment of such applications was left somewhat unclear. *See infra* pp. 1508–1509.

The rule adopted the U.S. Census Bureau's definition of "rural," which treats as rural all areas outside of those with more than 2500 inhabitants and outside of "urbanized areas." *Id.* at 574 paras. 36–37. Urbanized areas are "composed of an incorporated area and surrounding densely settled areas that together have a combined population of at least 50,000." *Id.* at 575 para. 39. This measure is used to allow the Census Bureau to define clearly the physical extent of an urban area even when suburbs are unincorporated. *Id.* at para. 38. The Commission had not included this particular definition in the alternatives listed in the NPRM.

NCTA asserts that the FCC failed to give sufficient notice of the definition of "rural" that it would adopt; based its rule on insufficient or non-existent evidence; and neglected its statutory duty to grant new markets to common carriers, such as local phone companies, only when such expansion serves the "public convenience and necessity" under section 214 of the Communications Act, 47 U.S.C. § 214(a) (1982). We uphold the FCC's actions.

## II

The purpose of the NPRM is to "provide an accurate picture of the reasoning that has led the agency to the proposed rule," so that interested parties can contest that reasoning if they wish. *Connecticut Light & Power Co. v. Nuclear Regulatory Commission,* 673 F.2d 525, 530 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *see* H.Rep. No. 1980, 79th Cong., 2d Sess. 24 (1946). Here, the FCC proposed in its NPRM a definition of "rural" that used a particular community population—1,500 residents—as the dividing line between rural and other communities. Its final rule adopted a larger population—2,500 residents—as the dividing line but took the same general form. The agency's general reasoning behind either form is clearly quite similar, and arguments against using simply a community population figure apply equally well to using 1,500 or 2,500 residents as the dividing line. The FCC's exclusion of "urbanized areas" seems consistent with using a particular size of community as the dividing line, given that not all "communities" are corporate entities. The agency's NPRM therefore did not deprive this court of an accurate picture of the agency's reasoning or deprive interested parties of the opportunity to contest that reasoning.

An agency, after all, must be free to adopt a final rule not described exactly in the NPRM, where the difference is sufficiently minor, or agencies could not change a rule in response to valid comments without beginning the rulemaking anew. *See Sierra Club v. Costle,* 657 F.2d 298, 352 (D.C.Cir.1981); *Weyerhaeuser Co. v. Costle,* 590 F.2d 1011, 1031 (D.C.Cir.1978). This court has held that the FCC may benefit from this general rule. *See Telocator Network of America v. FCC,* 691 F.2d 525, 540 (D.C.Cir.1982); *Owensboro on the Air, Inc. v. United States,* 262 F.2d 702, 707–08 (D.C.Cir.1958), *cert. denied,* 360 U.S. 911, 79 S.Ct. 1296, 2 L.Ed.2d 1261 (1959). We hold here that the FCC's NPRM fairly revealed the reasoning behind the proposed alternative finally adopted in slightly modified form, and thus that the agency's action was not in this respect deficient.

## III

Our standard of review is whether the FCC's actions were arbitrary or capricious. 5 U.S.C. § 706(2)(A) (1982); *see Loyola University v. FCC,* 670 F.2d 1222, 1226 (D.C.Cir.1982). This standard is a highly deferential one, but the agency's choice must still bear some rational rela-

tionship to the facts before it. *See Motor Vehicles Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Before resolving the substantive disputes in the case, however, we must place the rule in the context of the framework that Congress and the FCC have erected to regulate phone companies that wish to provide cable programming.

Section 214 of the Communications Act requires a phone company seeking to expand its services to receive from the FCC a certificate of "present or future public convenience and necessity." 47 U.S.C. § 214(a) (1982). The 1970 cross-ownership rules warned any phone company wishing to expand its services to include cable television that the FCC would automatically deny the company's section 214 application unless the phone company could demonstrate that independent cable service in the relevant service area was "infeasible." Companies able to make this demonstration still had to show that the service was a matter of public convenience and necessity. The 1979 rules allowed phone companies to show infeasibility by demonstrating that there were fewer than 30 homes per mile of cable in the service area, so long as no independent cable company stepped forward with a present intention to offer service. *See* 82 F.C.C.2d at 243 paras. 24–25 (proof of density); *id.* para. 26 (present intentions of independent operators). A section 214 finding was then conceivable. *See id.* at para. 23 (application for waiver must demonstrate public convenience and necessity). The 1980 rules allow phone companies to proceed directly to a section 214 application after showing that the service area proposed is completely "rural" as defined by the U.S. Census Bureau, 88 F.C.C.2d at 574 para. 37. Such phone companies must still obtain a certificate of public necessity and convenience before expanding their services to include cable programming.

The rule at issue in this case explicitly acknowledges the continuing need to obtain a certificate of public necessity and convenience, but the rule is somewhat unclear as to just what arguments against a phone company's application the Commission will continue to entertain in section 214 proceedings. As our interpretation of the Commission's implicit resolution of this question is important to our holding, we reproduce the relevant paragraph of the FCC's statement in full:

We wish to make it clear that any party filling [sic] an opposition to a Section 214 application to which the exemption may apply must confine its arguments to issues relevant to whether the "public convenience and necessity" will be served by the applicant's proposal. For example, an opposition may contain current Census Bureau figures showing that an exemption claimed pursuant to Section 63.01(r) [the rural exemption] is inapplicable. However, considering the years that many rural areas have gone without cable service while we have precluded telephone company involvement, we believe it would be inappropriate and counterproductive for us to continue to take into account naked assertions that independent cable television service is feasible in these areas.

88 F.C.C.2d at 576 para. 44.

■ Over the years, the FCC has exercised its discretion to lessen the burden a phone company must meet in seeking a certificate of public convenience and necessity under section 214. The rule at issue here clearly continues this trend. The prohibition against "naked assertions" of feasibility adopted by the 1980 rule prevents cable companies with no intention of providing cable service to the areas in question from delaying the phone company's provision of cable service. Because feasibility requires only the showing that independent cable service by *someone* is possible at *some* future date, a cable company could, before the adoption of the 1980 rules, force a phone company into a lengthy and technical battle over density along the proposed route merely by raising the issue. The new rule prohibits this tactic. Given that phone companies are exempt from the waiver requirements only where a decade of giving cable companies the benefit of the doubt has failed to produce independent

cable service, the FCC rule is not arbitrary or capricious in prohibiting "naked assertions" of feasibility.

■ The paragraph reproduced above is unclear as to what options remain for a cable company wishing to contest a phone company's application under section 214 for the provision of cable services. It is clear from the decisions of this court, however, that the FCC must follow its own rules and decisions. *See Teleprompter Cable Communications Corp. v. FCC*, 565 F.2d 736, 741–42 (D.C.Cir.1977) (involving change in rules shifting burdens of proof in cable certification hearings); *see also Way of Life Television Network, Inc. v. FCC*, 593 F.2d 1356, 1359 (D.C.Cir.1979) (involving failure to publish required list in *Federal Register*).

■ The FCC has here explicitly stated that it continues to endorse the policies underlying the general prohibition of cross-ownership:

> We are not rejecting the policies underlying the cross-ownership rules. We merely find them to be overly costly in rural areas.

88 F.C.C.2d at 573 para. 31. The Commission must, therefore, continue to act so as to serve the rationale of the unchanged underlying policy where the costs of doing so in rural areas are not excessive. We hold that, if the FCC is to be consistent with its own statement of policy, it must in a section 214 proceeding hear arguments on the present intentions of independent cable providers to serve the area at issue and on the anticompetitive effects that may result from granting a local phone company the right to provide cable services; and that the Commission must take those arguments into account in determining whether to grant the phone company a certificate of public convenience and necessity. As we have discussed above, however, the Commission need not hear or take into account assertions about the mere "feasibility" of independent cable service.

■ When a cable company asserts that it has a present intention to provide service to some part of the area in question, the reasoning behind the cross-ownership prohibition mandates that the FCC hear and take into account such assertions in a section 214 proceeding. The cross-ownership rules are designed to favor independent cable service over cable services provided by phone companies. *See generally* 82 F.C.C.2d at 234 (discussing numerous FCC actions to "redress the competitive imbalance" between phone companies and cable companies). If independent service is not forthcoming, however, the cross-ownership rules have always allowed phone companies to provide service. The 1979 changes in the waiver proceedings, and the 1980 exemption therefrom, were designed to ensure that phone companies could provide service quickly and profitably when independent service was not forthcoming. If an independent cable company asserts that it has a present intention to provide cable service to part of the area in question at a section 214 proceeding, however, independent service clearly may well be forthcoming. The FCC must therefore hear such assertions if it is to follow the reasoning behind its cross-ownership rules.

Hearing such assertions may cause some delay and additional expense, and thus to some extent reduces the savings in time and money that would otherwise result from the exemption rule. It may even be that some cable companies will make their assertions only to delay the grant to the phone company of a certificate of public convenience and necessity. Nonetheless, it is the FCC itself that asserted it was continuing to adhere to the general principles behind the cross-ownership rule. The FCC cannot narrow the question at issue here to that of a particular modification of a general rule, and thus reduce the scope of support that it must produce to justify the rule, without continuing to adhere to the principles of the general rule. The FCC remains free to use its statutory and rulemaking authority to design section 214 proceedings that minimize the potential for abuse by cable companies, and it may of course determine that asserted present intentions do not match a cable company's true present intentions or its foreseeable capabilities. The Commission must, however, provide cable companies with an op-

portunity to demonstrate in the section 214 proceeding a present intention to provide service to part or all of the area in question, and must take such evidence into account in deciding to grant *vel non* the certificate of public convenience and necessity to the local phone company.

■ Our reasoning and conclusion are similar with respect to assertions of the anticompetitive effects of granting a phone company a section 214 certificate for the provision of cable services. A driving force behind the general prohibition against cross-ownership is the fear that phone companies will use their local monopoly power over phone lines and poles to engage in anticompetitive practices with respect to cable services. If cable companies wish to allege in a section 214 proceeding that allowing a local phone company to provide cable services will reduce the public convenience and necessity by allowing the local phone company to engage in anticompetitive practices, the FCC must, if it is to be consistent with its own prior statements, allow them to do so and must take such allegations into consideration. Indeed, the FCC might well be required to take such factors into account even if it were to abandon entirely the cross-ownership rules. *See United States v. FCC,* 652 F.2d 72, 87 (D.C.Cir.1980) (*en banc*) (discussing *Denver & Rio Grande Western Railroad v. United States,* 387 U.S. 485, 87 S.Ct. 1754, 18 L.Ed.2d 905 (1967)).

As with the assertions of independent cable companies of a present intention to provide services, the FCC is free, subject to the usual possibilities of judicial review, to refine the section 214 procedure to minimize whatever dangers of abuse by the cable companies it perceives.

## IV

■ The changes in the FCC's standards from the 1979 procedures to the 1980 exemption are relatively minor. Given the continuing availability of the section 214 proceeding as a forum for raising concerns which, if unheard, might defeat the FCC's assertion that it was not abandoning the cross-ownership rules, we hold that the FCC's basis for adopting the rule was not

so inadequate as to be an arbitrary and capricious action.

NCTA argues that the Commission failed to show any benefits of the new rules compared to the 1979 waiver procedures, especially in light of the alternative of granting uncontested waivers immediately. The Commission asserts that local phone companies are intimidated by unfamiliarity with governmental procedures and that both the Commission and the phone companies were often caused needless expense and delay. 88 F.C.C.2d at 572 para. 29; 84 F.C.C.2d at 338–39 para. 10. These assertions are reasonable. The phone companies involved are local entities that may be unfamiliar with the intricacies of the federal government's procedures, and their provision of cable services is not particularly profitable—or an independent cable company would be expected to have already offered its services. 88 F.C.C.2d at 572 para. 29. The FCC also asserts that some oppositions based on feasibility may have been designed simply to delay the provision of cable services by local phone companies. The new rule, interpreted in light of the Commission's long-standing rationales behind the cross-ownership rules, minimizes the possibility of such delays but still allows cable companies to raise more crucial objections during the section 214 proceedings.

■ NCTA also argues that the Commission articulated no rational relationship between its policies and the non-density-related definition of "rural" that the Commission adopted. It must be admitted that the Commission offers little in the way of direct, affirmative evidence that the non-density-related definition is a useful determinant of the feasibility of independent cable service. The Commission instead argues that it adopted the only definition sufficiently certain to make workable the blanket exemption from the cross-ownership prohibition, and that a precise relationship between the definition and the feasibility of independent service is unnecessary given that the exemption applies only to areas where no independent cable service has actually appeared despite a decade of opportunity. 88 F.C.C.2d at 573 para. 32, 574

para. 34, 576 para. 44. These justifications could conceivably be insufficient if the exemptions from the cross-ownership prohibitions were not "backstopped" by the section 214 hearing and were not limited to areas unserved after a decade of opportunity for independent cable providers. Because of the arguments that the FCC must hear and consider in its section 214 proceeding, however, and because the FCC plausibly states that the impediments that hindered independent cable providers between 1970 and 1980 are unlikely to disappear, we uphold the FCC's decision to adopt the Census Bureau's non-density-related definition of "rural."

*Affirmed.*

MacKinnon, Senior Circuit Judge, filed a concurring opinion.