John B. HARALSON, et al., Plaintiffs,

v.

The FEDERAL HOME LOAN BANK
BOARD, et al., Defendants
(Two Cases).

Civ. A. Nos. 86–1218, 86–1270.

United States District Court,
District of Columbia.

Jan. 13, 1987.

Stephen D. Susman, Randall W. Wilson, Susman, Godfrey & McGowan, Houston, Tex., Judah Best, Ronald S. Cooper, Howard H. Stahl, Steptoe & Johnson, Washington, D.C., for plaintiffs.

Kirk K. Van Tine, Baker & Botts, Washington, D.C., William K. Black, Paul W. Grace, Peter A. Moir, Federal Home Loan Bank Bd., Washington, D.C., for defendants.

MEMORANDUM OPINION

NORMA HOLLOWAY JOHNSON, District Judge.

I. The Classification of Assets Regulations

A. The Proposed Rule

On July 2, 1986, the Federal Home Loan Bank Board published in the Federal Register a Notice of Proposed Rulemaking ("NPRM"). The FHLBB, as operating head of the FSLIC, proposed to adopt a new method of classifying certain commercial loans, and to revise its regulation regarding the reevaluation of assets by its examination staff. The reasons given in the NRPM for the new rule were as follows.

The FHLBB has statutory authority to conduct examinations of institutions the accounts of which are insured by the FSLIC. Section 403(b) of the National Housing Act ("NHA"), 12 U.S.C. § 1726(b) (1982) provides for examinations of insured institutions when from time to time necessary, in the judgment of the FSLIC, for the institutions protection and the protection of the FSLIC insurance fund. Pursuant to this authority, the FHLBB may examine and evaluate insured institutions' assets and require reporting and treatment of these assets for regulatory evaluation purposes. The NHA also requires all insured institutions to provide adequate reserves established in accordance with FHLBB regulations.

The Garn-St. Germain Depository Institutions Act of 1982 ("DIA") (Pub.L. No. 97-320, 96 Stat. 1469, effective October 15, 1982), granted new powers to federally chartered savings and loan associations and mutual savings banks ("federal associations"). The DIA authorized federal asso-

ciations to invest in secured or unsecured loans for commercial, corporate, business or agricultural purposes. The legislative history of the provision indicates that Congress intended to authorize, to a limited extent, "commercial lending" similar to that practiced by national banks. Many state chartered insured institutions have also been granted similar authority under state law.

During the past two years that this broader lending authority has been in effect, the FHLBB has observed that its traditional methods of classifying loans was not an effective method to categorize most commercial lending agreements. The old classification system was designed to evaluate home lending and focuses on the timely receipt of periodic repayments and other features of loans secured by real estate. This system, the FHLBB was concerned, might not adequately reflect the condition of commercial loans where payment schedules and other indicia of "current" status are of a different nature. As a result, the FHLBB felt it necessary to look at other methods of evaluating these types of loans.

The Bank Board noted a heightened interest in commercial lending by federal associations. An appropriate method of evaluating the assets securing those loans was desired before the scope of commercial lending activity increased further. The Bank Board also wanted a method that would serve to alert institutions and regulators on an early basis of any deterioration in the quality of commercial loan assets.

The proposed regulations were to apply only to commercial loans of the type described in section 5(c)(1)(R) of the Home Owners' Loan Act and 12 C.F.R. 545.46 (1985). Commercial loans secured by first liens on real estate and certain other assets traditionally assessed under the "scheduled items" approach were to be excluded. In the NPRM, however, the Bank Board specifically solicited comment on "whether a new evaluation method, if adopted, should also apply to all or some of those categories, for example, whether it should apply to commercial loans of all types, all loans that do not have regular payment schedules, ... etc." 50 Fed.Reg. at 27291 (1985).

The federal bank regulatory agencies [1] had much experience in reviewing commercial lending. The Bank Board looked to the classification system used by the federal bank regulatory agencies to analyze the quality of commercial loans. The Bank Board proposed to adopt the basic concepts contained in the "Uniform Agreement on the Classification of Assets ... Held by Banks" ("Uniform Agreement") issued in revised form on May 7, 1979, as the Joint Statement of the Office of the Controller of the Currency, the Federal Deposit Insurance Corporation, the Board of Governors of the Federal Reserve System, and the Conference of State Bank Supervisors. This latest Uniform Agreement further revised procedures first established in 1938.

The loan classification set forth in the Uniform Agreement expresses different degrees of risk of nonpayment of the loan. Problem assets are classified as either (1) Substandard, (2) Doubtful, or (3) Loss. Each category is defined as indicated below, following in substantial part the Uniform Agreement language and training materials used by the banking agencies.

1. Substandard

A Substandard asset is inadequately protected by the current [net worth] and paying capacity of the obligor or of the collaterial [sic] pledged, if any. Assets so classified must have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt. They are characterized by the distinct possibility that the [insured institution] will sustain some loss if the deficiencies are not corrected. 12 C.F.R. § 561.16c(b)(1)(1985).

2. Doubtful

An asset classified Doubtful has all the weaknesses inherent in one classified Substandard with the added characteristic that the weaknesses make collection or liquidation in full, on the basis of currently existing facts, conditions, and values, highly questionable and improbable. 12 C.F.R. § 561.16c(b)(2).

---

1. These agencies are the Federal Reserve Bank, the Federal Deposit Insurance Company, the Conference of State Bank Supervisors, and the Comptroller of the Currency.

### 3. Loss

Assets classified Loss are considered uncollectible and of such little value that their continuance as assets is not warranted. This classification does not mean that the asset has absolutely no recovery or salvage value, but rather it is not practical or desirable to defer writing off this basically worthless asset even though partial recovery may be effected in the future. 12 C.F.R. § 561.16c(b)(3).

Under the proposed regulations, assets classified as Substandard would be treated as a type of scheduled item. The institutions regulatory net-worth requirement would be increased to reflect 20 percent of such loans. Loans classified as Doubtful would require establishment of a specific reserve of 50 percent, and loans classified as Loss, 100 percent. As specific reserves do not count as eligible net worth items, the institutions' net-worth would be reduced accordingly.

In the NPRM the Bank Board noted that the proposal differed from commercial bank treatment in a number of ways. First, bank assets classified as Substandard do not require the establishment of reserves, nor do they increase banks' net-worth requirements. Second, the bank reserves established for assets classified as Doubtful and Loss reduce retained earnings of commercial banks but are later added back in calculating bank reserves so there is no additional reserve requirement as a result of the classification as there is under the proposed rule.

These differences were justified by the Bank Board by the fact that banks, unlike the federal associations, are subject to variable net-worth requirements based upon the quality of their assets. Additionally, it was pointed out that in practice, uncollectible bank loans are required to be promptly charged off, thus directly reducing bank net-worth.

The Bank Board also proposed to revise 12 C.F.R. 563.17–2(b), the appraisal provision in the Board's Examinations and Audits regulation for insured institutions. Rather than requiring the use of an appraisal to reevaluate real estate secured loans, the proposed change allows for evaluations that take into account economic factors that directly affect the immediate value of the assets from the insured institution's point of view. Examiners would consider factors such as market concentration, overbuilding in the geographic area, the ability of the borrower to complete the project, remaining funds, and the like. Finally, the Board proposed a Statement of Policy, 12 C.F.R. § 571.1a, meant to give insured institutions as much guidance as possible in classifying assets.

In response to the NPRM the Bank Board received 56 written comments from regulated federal associations, industry associations, and other federal agencies. The comments generally supported the institution of a classification system and supported the adoption of the system used by the federal regulatory agencies. About half of the commenters opposed the expansion of the regulations to include commercial loans secured by real estate. The Bank Board's traditional scheduled items approach, it was argued, was sufficient to protect against losses. A minority of commenters favored the extension of the regulations to include real estate secured loans. They argued that this would result in greater uniformity among financial institutions.

The overwhelming objection made by commenters was that the proposed revision to the regulations regarding reevaluation of real estate would give examiners too much discretion. The Bank Board was urged to formulate more specific and objective criteria to review, evaluate, and classify real estate assets in order to prevent arbitrary decisions.

### B. The Final Rule

On December 9, 1985, the Bank Board adopted the final Classification of Assets Regulations. The effective date of the rule was January 30, 1986. The final rule was published in the Federal Register on December 31, 1985, ("the Notice of Final Rule"). In that Notice of Final Rule, the Bank Board stated that it "solicits comments on the general scope of the classifi-

cation system and accordingly is providing for a 60–day comment period after which, if appropriate, the scope may be modified, extended, or otherwise addressed." 50 Fed.Reg. 53281 (December 31, 1985).

The Board had determined to include in the coverage of the classified system all assets except consumer loans, loans secured by one-to-four family owner-occupied homes, and securities. The Bank Board stated that "[s]ince in its proposal [the Board] specifically requested comments on whether the classification system should also apply to all or some of the loans currently assessed under the 'scheduled items' approach, the Board has determined that pursuant to 5 U.S.C. 553(b) and 12 C.F.R. 508.11 additional notice and public comment is unnecessary." *Id.*

The Board adopted without change the proposed basic framework for classification of assets contained in the Uniform Agreement. It was explained that assets may be classified in more than one category, and a portion of an asset may remain unclassified. The Principal Supervisory Agent ("PSA"), or a Supervisory Agent designated by the PSA, has the authority to approve or disapprove the examiners classification. In the event of any disagreement over the value of the reappraised real estate, the PSA has final authority to approve or disapprove appraisals and valuations.

The Board included in its Notice of Final Rule a lengthy discussion of acquisition, development and construction loans ("ADC loans"). Studies were cited [2] which confirmed a link between the higher expected rate of return and greater risks associated with ADC loans and analogous investments. In addition, the Bank Board's Office of Policy and Economic Research ("OPER") found a substantially higher level of problem assets reported by the top 40 holders of ADC type loans, than by other institutions with over $100 million in assets.

The Board stated that its supervisory experience supported the studies' findings. The institutions that have failed recently and caused the largest losses to the FSLIC have all involved substantial losses from ADC type loans. Several examples were cited. A detailed explanation of reasons why the old scheduled items approach was unable to identify problem ADC loans and similar assets on a timely basis was given.

In response to comments addressing the desirability of adopting more objective standards for classifying real estate assets and the importance of requiring proper appraisals, the Board's policy statement set out specific criteria for each classification. The Board also stated that it considered the definitive interpretation of its appraisal regulations to be its Office of Examinations and Supervision Memorandum No. R41b ("R41b"), Appraisal Policies and Practices of Insured Institutions and Service Corporations (March 12, 1982). R41b, it was stated, established important objective appraisal standards.

The final regulation established four special classification rules for real estate secured loans. They are based on the perceived adequacy of existing appraisals relating to such loans. These rules are:

1. If the existing appraisal is not in conformance with Board appraisal standards, the loan is classified as substandard. 12 C.F.R. § 571.1a(a)(7); 12 C.F.R. § 563.17–2(b)(2)(1986).

2. If the assumptions underlying the appraisal are "demonstrably incorrect", the loan is classified as doubtful. *Id.*

3. If the assumptions underlying the appraisals are "demonstrably incorrect" and the loan also has a "well-defined weakness" of a substandard loan, the loan is classified as doubtful. 12 C.F.R. § 571.1a(b)(3); 12 C.F.R. § 567.17–2(b)(3)(ii) (1986).

4. If there is no appraisal, the loan is classified as doubtful. *Id.*

---

**2.** *See* Equity Participation in Real Estate by Savings and Loans: Implications for Profitability and Risk, OPER Invited Working Paper No. 52 (May 1985), Administrative Record Exhibit 3;

Memorandum from Joe McKenzie to Eric Hemel, Director, OPER, dated December 6, 1985, Administrative Record Exhibit 13.

The final rule also provided that if a classified asset secured by real estate had been appraised in conformance with the Board's appraisal standards, the insured institution was to establish a specific loss reserve "equal to the amount by which the valuation of the asset on the books of the association exceeds the value established by such appraisal." 12 C.F.R. § 561.-16(c)(2)(i).

The Board received an additional 56 comments in response to its Notice of Final Rule and solicitation of comments. While agreeing that some type of regulation was called for, many commenters expressed surprise at the changes made by the Board in its final rule. The most prevalent criticism was that the new rule "totally ignores the reality of loan losses which can expect to be incurred", (Sun Savings and Loan) provides "mathematical calculations as substitutes for judgment", (Newport News Savings and Loan Association) and encourages "myopic analyses of loan quality" (First Indiana Federal Savings). American Federal Bank contended that the regulations could force well managed institutions into net-worth deficient positions and result in "artificially created supervisory cases."

Although the Board had assured adequate training of examiners would be undertaken in its Notice of Final Rule, there was also a widely expressed concern that the examiners applying the new regulations would have inadequate experience and training. It was pointed out by one of the commenters that the staff of examiners had just recently been reorganized within the Bank Board and was composed of mostly new, young, unexperienced people lacking the technical expertise needed to adequately understand the banking business.

In addition to the training problems, a related common objection was that the new regulations gave the examiners too much discretion which would allow for inconsistent, arbitrary decisions by the examiners. This was compounded by the absence of definitions of key language found in the regulations and disagreement within the banking industry as to the proper interpretation of certain provisions such as R41b.

Other comments addressed the lack of any lead in time before the effectiveness of the new rules, the failure of the new rules to require conformity with GAAP practices, the failure to target certain high risk institutions where the bulk of the FSLIC risk of loss lies, and procedural inadequacies in the promulgation of the rules.

## II. Plaintiff's Challenge to the Regulations

Plaintiff challenges the validity of the Bank Board's Classification of Assets regulation on two grounds. First, he asserts that the final regulation was not a logical outgrowth of the proposed rule. Secondly, he asserts that the Classification Regulation is arbitrary on its face.

### A. Adequacy of the Notice of Proposed Rulemaking

The Administrative Procedure Act ("APA") 5 U.S.C. § 553(b) (1982), requires an agency engaged in informal rulemaking to publish a notice of proposed rulemaking in the Federal Register. There is no dispute that notice was published in 50 Fed. Reg. 27291 (1985). The notice must include "either the terms or substance of the proposed rule or a description of the subjects and issues involved." § 553(b)(3) (1982). After publication of the notice, § 553(c) requires that "the agency shall give interested persons an opportunity to participate in rulemaking through submission of written data, views or arguments . . ." *Id.*

The purpose of the notice and comment provisions of § 553 as described by the U.S. Court of Appeals for the District of Columbia Circuit, "is to allow interested members of the public to communicate information, concerns, and criticism to the agency during the rulemaking process." *Connecticut Light & Power Co. v. NRC,* 673 F.2d 525, 533 (D.C.Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982). Interested parties cannot meaningfully comment upon the agency's proposal if they do not have an accurate picture of the reasoning that led the agency to the proposed rule. *Id.; see also National Cable Television v. FCC,* 747 F.2d 1503 (D.C.

Cir.1984). Without meaningful comments, it is feared that the agency may operate "with a one-sided or mistaken picture of the issues at stake in rulemaking." *Connecticut Light*, at 530.

Plaintiff argues that the final rule adopted by the Bank Board "diverged dramatically from the proposed regulation...." Plaintiff's Memorandum at 13 (June 30, 1986). It is argued that "[t]he proposed rule did not suggest that the final rule would apply the classification scheme to real estate-secured loans, much less that the final rule would authorize automatic, drastic write-downs of net worth based upon finding defects in existing appraisals." Plaintiff's Reply Memorandum at 7.

Plaintiff alleges that the NPRM was inadequate in four areas. The NPRM did not give notice that: (1) the regulations include special rules which would apply only to real estate-secured loans; (2) examiners would be able to use methods other than appraisals to reevaluate real estate-secured loan; (3) as a result of reevaluation of assets, the association's net worth could be reduced; (4) and appraisals of real estate which secured association loans would have to conform with the standards set out in Bank Board memorandum R41b.

■ Defendants assert that "[t]he proposed regulations specifically apprised interested parties of the potential applicability to assets secured by real estate." Defendant's Memorandum at 22 (July 31, 1986). Comments were specifically solicited "on whether a new evaluation method, if adopted, should also apply to all or some of those categories, for example, whether it should apply to commercial loans of all types ..." 50 Fed.Reg. at 27291.

This Court must agree with defendant on this point. As required, the NPRM adequately framed the subject for discussion. *Connecticut Light*, at 533. As the above quoted language indicates, the issue was directly addressed in the NRPM. Comments, on the subject solicited by the NPRM expressly discussed the applicability of the proposed regulations to real estate-secured loans. *See, e.g.*, Comment of First Federal of South Carolina. That such com-

ments were elicited by the NPRM indicates that interested parties knew of, and were able to respond to, the agency's idea. Thus, the purpose of the notice and comment requirement was fulfilled.

■ Plaintiff similarly argues that there was no notice that examiners would consider inadequate appraisals along with other factors when reevaluating loans. Defendants cite language in the NPRM which states "reevaluation of real estate may be based upon appraisal ... or other appropriate evaluation methods as determined by the examiners." 50 Fed.Reg. 27293. The NPRM also lists a number of factors the examiner should consider in evaluating real-estate secured loans, and gives an example of how the evaluation would proceed. *Id.* This clear and express language in the NPRM is sufficient notice to apprise interested parties of the issues before the agency. Meaningful participation was possible, and several comments were received addressing this subject, as well.

■ Plaintiff claims the Classification of Assets regulations goes beyond the scope of the proposed rule in that a financial association's net worth could be reduced under the new rule, while no such possibility existed under the scheme of the Uniform Agreement which was the basis of the proposed rule. "It is, of course, elementary that a final rule need not be identical to the original proposed rule." *AFL–CIO v. Donovan*, 757 F.2d 330, 338 (D.C.Cir.1985). The final rule is expected to be improved as a result of the comments received by the agency from interested parties. *Id.* The Court must determine "whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." *Id.* (citations omitted).

In this instance, after receiving comments on the proposed rule, the Bank Board explained its reason for according federal associations different treatment as to the effect the regulations have on net worth than that accorded banks under the Uniform Agreement. These reasons stemmed from differences in the required ratios of capital of the respective institutions. Defendants note that in practice,

even if a bank is not required to reduce net worth directly due to the establishment of a reserve, bad loans are to be promptly charged off. While the accounting methods used by each type of institution might differ, the end result on net worth is nonetheless the same.

This Court cannot say that because an application of the final rule might implicate the net worth of an association, that the change in the final rule from the proposal was not a logical outgrowth of the rulemaking proceeding. The difference between the final rule and the proposal scheme is in essence a procedural one, as the substantive effect of a high risk loan will be the same under either system, and the Board adequately explained a logical reason for the change.

The deviation in the final rule was not so sharp as to deprive affected parties of notice and an opportunity to respond. *AFL–CIO*, at 338. "An agency, after all, must be free to adopt a final rule not described exactly in the NPRM, where the difference is sufficiently minor, or agencies could not change a rule in response to valid comments without beginning rulemaking anew." *National Cable Television*, at 1507; *Air Transport Ass'n. of America v. CAB*, 732 F.2d 219, 224 (D.C.Cir.1984). Here, in their preamble to the final rule, the Bank Board specifically addressed comments it had received on the treatment of classified assets and net worth.

Plaintiff's final challenge to the adequacy of the Board's notice stems from the Bank Board's use of Memorandum R41b as the standard by which appraisals are to be judged. While the final rule mentions that appraisals must "conform with Board appraisal standards", R41b is not formally made a part of the final rule. It is also alleged that there is no agreement within the banking industry on the proper interpretation of R41b, thereby rendering R41b void for vagueness.

Defendants claim R41b is merely a statement of policy, thus exempt from the notice and comment requirements of the APA. Even if it is found by this Court to be a substantive rule, it is argued that notice of its potential use was given in the NPRM, and that it has been widely used in the past by the industry.

■ "The term 'general statement of policy' has been explicated in the Attorney General's Manual as embracing 'statements issued by an agency to advise the public *prospectively* of the manner in which the agency proposed to exercise a *discretionary* power.'" *Washington Federal Savings & Loan Ass'n v. FHLBB*, 526 F.Supp. 343 (N.D.Ohio 1981) (citing *Guardian Federal Savings & Loan Ass'n v. FSLIC*, 589 F.2d 658, 666 (D.C.Cir.1978). If a so-called policy statement narrowly limits administrative discretion it will be considered a binding rule of substantive law. *Id.*

Here, as in the rule at issue in *Washington Federal*, R41b contains mandatory language. Although the adequacy of an appraisal is only one factor for the examiner to consider, the Classification of Assets regulations require that if an appraisal does not conform to R41b, a particular classification will be imposed on that asset. 12 C.F.R. § 571a(a)(7); 12 C.F.R. § 563.17–2(b)(2) (1986). The discretion of the examiner is thereby limited by R41b, thus it is not a statement of policy, but a substantive rule.

Nor is R41b exempt from the notice and comment requirements as an interpretive rule. "Interpretive rules generally give the public notice of agency statutory or rule construction ..." *Id.* Like R–48 in *Washington Federal*, R41b "defines criteria for the 'proper accounting treatment' of [certain] transaction...." *Id.* In fact, the criteria set out in the R41b memoranda are quite specific and detailed. It is therefore subject to the notice provisions of § 553 of the APA if it is to have the force of law.

■ Defendants urge that even if R41b is considered a substantive provision, adequate notice of its use was given in the NPRM. Defendants cite to a list of factors to which they claim provides that notice. Those factors, however, relate to the reliability of an appraisal in light of other eco-

nomic conditions, such as marketability of the property appraised, adequacy of remaining funds, and the likelihood of completion of the project. The provisions of R41b, on the other hand, are addressed to the sufficiency and format of the appraisal itself. They include items such as how to define market value, the use of a self-contained, narrative format, the inclusion of an economic feasibility report and sales history analysis. Although defendants content that the language of the NPRM tracks the language of R41b, after a side by side comparison of these texts, this Court cannot agree. The difference in the respective provisions is great enough to find that there was no notice of the use of R41b in the NPRM.

Defendants rely on the mention of R41b in several comments received, to support the adequacy of the notice provided. Many of the comments to which defendants cite, however, were included in the second group of comments received after publication of the final rule. A reading of the earlier set of comments indicates that several commenters independently suggested that the Bank Board adopt R41b as a part of the final rule. These comments were not in response to any suggestion by the Board's NPRM that R41b might be used. "As a general rule, [an agency] must itself provide notice of a regulatory proposal. Having failed to do so, it cannot bootstrap notice from a comment." *AFL–CIO* at 340.[3]

The Bank Board's action in this case was unusual in that a second comment period was initiated which extended beyond the effective date of the final rule. While the agency is to be commended for encouraging continued participation and input from the regulated industry, it is the initial NPRM and subsequent comments upon which the Bank Board's actions must stand or fall. If notice was defective in the NPRM, as it was here, a second comment period after the publication of the final rule is superfluous.

In this case, not only did the Bank Board fail to give adequate notice that R41b would be an integral part of the final rules, but the Bank Board also failed to even publish R41b as part of the final rule. Section 561.16c(c)(2)(i) refers merely to the "Board's appraisal standards." *Id.* It is only in the preamble to the final rule that R41b is identified as constituting those standards. Nowhere in the notice, the preamble, the statement of policy, or the regulations, is the text of R41b set out.

As in *Washington Federal,* this Court determines that R41b has no binding effect on an insured association, thus it did not bind Mercury or Milam. It would be arbitrary and capricious for the Bank Board to find Mercury and Milam insolvent by reason of an application of R41b, and to rest its decision to place the Association in conservatorship solely on that finding. *Washington Federal,* at 384.

This Court has already determined that summary judgment is inappropriate on the issue of whether the statutory grounds to impose a conservator were met in this case. The basis on which the Board rested its decision cannot be determined until the trial of that issue. If it is found at trial that the decision was based solely on an application of R41b, the Bank Board's decision cannot stand. If, however, it is shown the statutory grounds were met without the use of R41b, the Bank Board's action will be upheld. Without formal notice and comment on R41b, the Bank Board cannot rest a decision to impose receivership or conservatorship on an internal agency memorandum.

**B. Facial Validity of the Regulations**

Plaintiff's second major challenge to the validity of the Classification of Assets regulations stems from the claim that the regulations are arbitrary on their face. The

---

**3.** This situation differs from the notice issues discussed earlier by this Court where there was mention of the subject in the comments coupled with an express reference to the subject in the NPRM.

three arguments made by plaintiff to show that the regulation does not reflect reasoned decisionmaking are: (1) that the percentages on which the classification system is based do not correspond to actual loss exposure; (2) that § 563.17–2, the four part rules used to evaluate real estate secured loans, go beyond the scope of the notice given; and (3) that the regulations allow too much discretion to the examiners.

This Court must apply the arbitrary and capricious standard of the APA in reviewing the Bank Board's rulemaking proceedings. "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made'." *Motor Vehicle Manufacturers Ass'n v. State Farm,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (citation omitted).

■ In the preamble to the final rule, the Bank Board mentions comments received that addressed the classification scheme of 20%, 50%, and 100%. The Bank Board explained at length its reasons for using these figures, based on differing degrees of risk associated with the different classes of loans. These percentages are the same as those used in the Uniform Agreement for over 50 years. The Bank Board also states that "as long as methodology utilized to arrive at the overvaluation is acceptable to the SA the insured institution shall establish and maintain a loss reserve as a scheduled item or establishing the loss reserve imposed by the classification system." 50 Fed.Reg. at 53280.

It is apparent to this Court that the Board has considered the relevant factors here. Comments were made and considered by the Board, differences among different types of institutions were explained, and a method was adopted which is based on similar past practices by the industry. The Board enacted a final rule which specifically allows for flexibility when reevaluation takes place to reflect the reality of a given financial situation, rather than permitting only pre-determined percentage write-offs to be taken. On these facts, the agency's action is a rational response to a serious threat to the stability of this nation's financial institutions and the economy in general.

Plaintiff's second argument, that applying the rules to real estate assets goes beyond the scope of the notice, has already been addressed. Plaintiff challenged the application of the Classification of Assets regulations to real estate secured loans, and this Court found that adequate notice of such application had been given. Plaintiff also challenged the effect the regulations have on an institution's net worth, and this Court found that to be a logical outgrowth of the proposed rules. Now plaintiff attempts to combine these two claims into one by attacking the specific provisions of the rule encompassing the two issues. This Court finds this attempt to be without merit, and based on its prior reasoning upholds the agency's action.

■ Finally, plaintiff challenges the amount of discretion given to examiners under the new system. The defendants point out that the reasons for adopting the reevaluation of real estate rules was to provide more objective criteria for the examiners to use in making decisions. The Board states in its preamble "[i]n addition to applying objective standards, the final rule provides further protection against the fear of arbitrary classifications by the examiners. It is the SA who is empowered to order a valuation allowance. The express role provided for the District Appraiser in the final rule acts as a further check and balance." 50 Fed.Reg. at 53280–81.

The regulations as written are specific and detailed in their provisions. Some degree of discretion in evaluation is desired so that differences in sophisticated financial transactions and the surrounding circumstances may be taken into account by the examiner. The amount of discretion

allowed to the examiners based on the language of the regulations is not so great as to require us to hold the regulations facially invalid. There are clear limits on the examiners' exercise of discretion imposed by the regulations. Those limits allow review of an examiner's actions.

Of course, it is possible that the application of the regulations in a particular case may be arbitrary and the result of an 'abuse of the examiner's discretion. For example, an examiner may classify an entire asset when only a portion of the asset should be classified. Plaintiff has made such an 'as applied' challenge in this case. That issue cannot be resolved until the material facts in dispute with respect to the Bank Board's actions against the Associations are resolved at trial. If at that time it is found that the application of the regulations was arbitrary, that action will not be upheld. An Order consistent with this opinion will be issued.

## ORDER

Upon consideration of plaintiff's motion for partial summary judgment on Count 1 of the complaint (Classification of Assets regulations) in the above-captioned action, defendants' cross-motion for summary judgment on the Classification of Assets regulations, supporting and opposing memoranda, the arguments of counsel, and the entire record, it is this 13th day of January, 1987,

ORDERED that plaintiff's motion be granted in part, as it relates to the incorporation of R41b. As set forth in this Court's accompanying opinion, R41b has no binding effect on the Associations, thus unless it is found at trial that statutory grounds to impose a conservatorship existed without reliance on R41b, that action will not be upheld; it is further

ORDERED that defendants' motion be granted in part, as it relates to all other aspects of the promulgation of the Classification of Assets regulations except R41b; and it is further

ORDERED that plaintiff's motion and defendants' motion are in all other respects denied.